The Court takes the morning call of 2-18-0757, William Garza v. Kinnaly, Flaherty, and Krentz On behalf of Mr. Dimitrio, on behalf of the Kavaland, and Mr. Flaherty, Mr. Kinnaly, we have a problem. Sorry, gentlemen, it usually goes much smoother than this. We seem to have lost our... We lost our... We failed to... Okay. Thank you. I don't know. Mr. Dimitrio, good morning. Good morning. Hold on just one second. Do you have the timer? These people come from Chicago, they think we're a bunch of hillbillies out here. Things went smoothly until you got here, Mr. Dimitrio. You may proceed. May it please this Court? Yes, my name is Tom Dimitrio, and with Andrew Stevens and Mike Reagan, we represent the estate of Bill Murphy, and the executor, Bill Murphy Jr., is here with us today. Why is it that we're here? Bill Murphy, at age 84, signed a council agreement with the law firm, and subsequently, he died. He died in November of 2016. In June of 2017, the law firm settled a significant personal injury case called Siler. And on June 30th... Was there a do-not-disclose order as to the amount of that fee? I was informed by the law firm that it was a confidential amount. I do know it. They know it. But, yes, it's... There's a figure, and it's significant. Okay. And that Siler matter had been forwarded to the law firm by Bill Murphy. And I'm going to talk a minute about why 4B of the agreement controls what should occur here at the end of the day. But on June 30th, 2017, the law firm, on its letterhead, wrote Bill Murphy, the executor of his father's estate, a letter. And it should be pointed out that the law firm represented the estate. It had a fiduciary duty to the estate. And in that letter... What estate? June 30th, 2017 is the date. Yes, right, right. So the law firm represented who? The estate of Bill Murphy. Okay. The plaintiff in this case, if you will. It states in the letter that they did not have a written agreement with Bill's father. Obviously, that was wrong. I don't know if it was negligent. I don't know if it was a lie. But it was wrong. And the letter admits that your dad had an interest in the Siler case. And the type of interest is not explicit in the letter, correct? Yes. And the letter says, we will distribute $150,000 for your dad's interest in the case. Yes. And at the time that the case was referred by Mr. Murphy, he was obviously entitled to at least...  One-third, up until two months following the termination of his death. Isn't that what the contract says? No, sir. It does not say that. It does not say that. What does it say? The contract says that going to 4A first, which controls the personal injury, contingent fee, forwarding, referral fee, call it what we will. It says that Bill, and that's Bill Murphy, shall, not maybe, not if it's a good day for it, shall receive one-third of any contingent fee received by the firm. When the fee is collected. When the fee is collected. 4E refers to something apart from a personal injury contingent fee agreement. That is what you are referring to, Your Honor. Well, don't we read the agreement in its entirety together? We should. And that's what was not done downstairs. Okay. In the event this agreement is terminated for any reason, KKLH payment obligations are limited to paying WCM any amounts collected for which it owes WCM fees for a period of two months following a month in which the termination becomes effective. Exactly. Any amounts collected. Bill also did hourly work. He did different stuff for trusts. And the purpose of 4E was so when Bill died, termination, when Bill died, the firm didn't want to spend a whole lot of time running around collecting monies owed to, well, Bill and the firm. Because Bill only got received by contract one-third of whatever fees were generated. And so 4E is very specific. It talks about amounts collected. The personal injury fee, the time when it would be collected can't be known in our world. You don't know when a case is going to settle. You can manipulate when a case is going to settle, which is another reason why 4E would not apply to a personal injury contingency referral matter. So the office, for instance, could say, gee, it's a two-month wait. Let's wait until three or four months to collect this fee so then we don't have to pay. Exactly. There are such lawyers out there. Bill, I think, I hope you take judicial notice, was a rather accomplished, competent, sharp, sharp guy. Well, that's the reason for the agreement to bring him in as a rainmaker for the firm. Exactly. Because he had a stellar reputation and people came to him. Exactly. And I take great exception with the firm telling you in writing that they compassionately took in Bill Murphy. So his 12-year twilight of his career, I call it the hospice defense. They state, we are only one to honor Bill's end-of-life decisions. And I can categorically, and I guess I have everybody at a disadvantage because I knew Bill so well. I served with him for 15 years on the IPI committee with Mike Reagan. He would not, under any set of circumstances, say, gee, it's my end-of-life decision that if that Siler matter doesn't settle and get paid out within two months of my death, I waive it. Was there any attempt by Mr. Murphy to once, in terms of the letter that he wrote to his son, to go back and say, let's clarify this agreement? No, sir. Because? It's your position no clarification was necessary. Exactly. Because a contingent fee is a contingent fee. I agree. But this is not your traditional referral fee, correct? Exactly. Rule 1.5C does not apply. Right. That's why the Silers were not involved. This was firm Murphy. And the fact is, Bill, when he wrote his letter, handwritten to his son, stating point blank, in the event of my death, the Siler matter, I'm entitled to one-third of the fee. And here's the agreement he attaches to that handwritten letter. That's how self-assured he was that 4B controlled it. And so there was no need to clarify anything because, unlike the trial court here, I don't find this agreement ambiguous at all. But only because 4B is in and of itself. 4E is what the trial court hung its hat on. And he basically saw the words fees and all fees. And the fact is, it was meant to prevent this firm to not be a collection agency. The problem with your analysis is that E refers to payments are limited to paying WCM any amounts collected for which it owes WCM fees. Collected. Okay. That's, yes. They didn't collect. That's key. They didn't collect until after two months following the termination of the agreement. That's why that doesn't apply to here. The Siler matter does not apply to when Bill died. He had, you know, there were fees due and owing at that time in his life to the firm and then thus to him. And so any. What kind of fees are you talking about, Mr. Demetrio? You mean like hourly work that he did or estate work or something other than a PI case? Any, I don't know. Any fees that were collected by the firm at the time that Bill died and then within the first two months. Can you address the issue of discovery? Sure. You did not ask for discovery unless the court would find that the agreement was unambiguous, correct? Well, that's true. We wrote that. And if the agreement was not ambiguous. Then no discovery was necessary. No discovery would be necessary. So we believe that, and we maintain this from day one, that 4B controlled the issue of the Siler matter. And the defendant, after telling the client that we had no written agreement with your dad. And so therefore, your father's limited to quantum merowit. They plucked that out of the air. There was never a mention of quantum merowit. Did he do any work on the case? Yes, he did. And they also wrongfully said in the letter, your dad really didn't do much on the case. Discovery would show he did a lot on the case. But the fact is that's not relevant. Even though he did do a lot of work on the case. But they paint a picture of, he did so little work. He's entitled to less than $20,000. But we loved him so much and we're such good guys. We're going to give you $150,000, Bill. And the Silers agree with us. Do you think the fact that, well, first of all, they're saying you can't collect if it's after two months. That's the way they're interpreting this contract, correct? I don't know. Well, I do know what they're doing. But the fact is. Your point is that no attorney who refers a case would do that. I can tell you, I've been doing this for 45 years. How many? 45. I know. I'm right behind you. I can tell you that plaintiff personal injury lawyers are not the most gratuitous people in the world. And they are not going to waive when they have, at age 91. He was 91 years old when he brought this case in. Bill Murphy tried a case when he was 90. And when he was 91 years old, he brought this case in. And I can assure you, no plaintiff's lawyer in the world would say, I have an end of life wish here. And that is that my two daughters and my son only get my very significant fee, I'm due, but only if they collect it within two months of my death. The firm argues that Mr. Mazur, who wrote the letter to Mr. Murphy, was not in the firm at the time of the agreement. So he was not aware of the agreement. Well, then they're just, they don't know what they're doing. Sloppy. They're sloppy. They're more than sloppy. They're negligent. He didn't do his due diligence. I'm going to write a letter to our own client to say there's no written agreement? Am I accurate there, guys? Did the estate accept the $150,000? No. Mr. Demetrio, if they paid $150,000 and their position was that they weren't obligated to pay after two months of his death, did they basically forfeit or give up this argument? I believe that that letter. That what? Letter, that admission that your father had an interest in the case. Now, he couldn't be wrong on that. Your father had an interest in the case is an admission that 4E did not apply to the Silerman, this personal injury case. Because it was already beyond two months. It's seven months, yes. So they're still saying he'd still have an interest here to take this money. If their position in front of this court is to be taken seriously, the question becomes, why then, if two months had elapsed, did they say your father had an interest in the case and it's quantum merit and here you go and here's some pennies? I do have a question. Did Mr. Murphy have any agreement, written or otherwise, that we're aware of with the Sellers? Silers. Silers, I'm sorry. That's all right. Did he have an agreement with them that he was referring or that he was entitled to anything as a result? No. Or if it resulted? No. Did he ever have that type of a relationship, to the best of your knowledge, with any referrals? No. Not since entering into this agreement. He wasn't going to get it through the firm. Yes. Like a lot of lawyers do. In fact, the agreement binds him. He couldn't refer it out to me or anybody else without the permission of the firm. So this is a very one-sided document. But I don't care because I really, really, it's crystal clear to me, okay, the difference between the words, when the fee is collected, he shall receive one-third, and he dies. Any amounts collected that were due at owing, we only go for two months and that's it. How about the fees? Perspective or retrospective? Well. Or both, depending on what paragraph you're talking about. You know, that's, you're making what we're trying to convey here, that 4E only applied to past due at owing bills to the company, to the firm or bill. And that the 4B only to prospective contingency fee matters. Siler being, you know, the only one. Well, the only one. We don't know if there were other cases that. There was another case that's referred to in the letter. I'm talking about besides that, were there other cases? No. Okay. No. But as he points out, you know, over the time of the agreement, it worked very well. The agreement worked very well. It was a lot. And I mean, the agreement, may I? Go ahead. The agreement, it's not well written anyway. It says termination. If any one of the principals of the firm retires, the agreement's overdone. Well, that's not right. That's not right. If Mr. Flaherty, well, he wasn't part of the. Well, no, he was at the time of this case. So right before the Saner case settled, Mr. Flaherty decides, I'm retiring. By the terms written in this agreement, bills out of luck. That's poorly written. Where? Somebody got disabled. All right. Thank you, Mr. Demetrio. You'll have time for rebuttal. Thank you. Mr. Flaherty. May it please the Court. Freedom of contract allows competent adults to determine when compensation is owed and when it is not owed. Bill Murphy agreed in paragraphs 4A, 4B, and 4C that he would be owed compensation when fees were collected, except in the case of debt under 4E, he would be owed only those fees collected within two months following his death. But why would he give up what could be a good-sized fee when nobody knows when a personal injury fee will occur, whether it's after trial, by settlement? And that had been throughout his entire career. Well, Your Honor, I don't know that anybody can look into Bill's mind with respect to this. I can give you a very common-sense explanation of what the thought process of the firm was. This was an end-of-life provision that was first included in this agreement 13 years earlier. Well, under 4A, B, and C, does it say he will collect these ways except in case of debt? No. It says that he will collect these fees. He will be owed and paid these fees upon collection, except, it does say. I don't know if it uses the word. But what it says is that that A, B, and C are modified by the death provision that says that when that happens, he only gets those fees collected within the first two months following the death. Why did the firm write the letter in June of 2017 saying that he still had an interest in the case? If you look at that letter very carefully, there are two very significant facts on the face of that letter. The letter says that there was no contract, mistakenly understood at the time, but that's what the letter says. Well, that's on the firm for making that statement. But it doesn't matter whose fault that is. The letter says there's no contract. So, therefore, the letter can't reflect the firm's interpretation of a contract that it didn't believe existed. Well, the firm, obviously, by the letter, believed that Bill Murphy still had an interest  And if you read further in that letter, that interest. I haven't read the letter. It refers to the quantumeruit interest, not a contractual interest, a quantumeruit interest, which is what the firm thought was the only viable way to compensate Bill in the absence of a contract. So it's been misrepresented from the day one of this litigation that that letter reflects the firm's interpretation of the contract when it plainly doesn't, and it's been misrepresented that the interest referred to is contractual when on the face of the letter it's not quantumeruit. So that answers both of those matters, I believe. The executive doesn't like the way 4E worked out at the end, even though the outcome was random and unpredictable from the start. But unhappiness with the conclusion isn't a cause of action, and it is what you see before you today. Unreasonable interpretations, disregard of precedent, and abandonment of common sense. Siler is not exempt from 4E on referral fee principles, and this is really important. Bill Murphy was an affiliated lawyer with a compensation agreement. He was not an unaffiliated lawyer with a fee-sharing agreement. It can't be a referral fee as a matter of law. Despite paying lip service to that reality, after willfully ignoring it for 17 months in three different courtrooms, the executor still argues on page 15 of its brief that Bill, quote, earned a fee at the time of, quote, referral. And this is very important, because that is what typically occurs when a lawyer forwards a case to a firm. That idea is what drives this lawsuit. Wait. Say that again? The attorney? On page 15 of their brief, they pay lip service to the fact that this is not a technical referral fee because it doesn't comply with Supreme Court rules. But they go on to say that, nevertheless, Bill has still earned a fee at the time of referral because that's what typically happens when lawyers refer cases to a law firm. And that idea is what drives the lawsuit because it is the only way a fee can be earned before collection or death in this case. Dismiss that idea, revoke that claim, and the entire House of Cards falls. And reiterating it in this court, after reiterating it in two other courtrooms, is unprincipled and it offends the law. The up-counsel agreement is the sole determinant of compensation in this case. And with respect to the up-counsel agreement, asylum is not excluded from IV-E based on the plain language of the contract. The IV-E phrase, payment obligations are limited to, unambiguously refers to all payment obligations in the preceding paragraphs of IV-A, IV-B, and IV-C. The executor's concession that it applies to IV-A and IV-C exposes the unreasonableness of claiming an exception for contingent fee cases in IV-B. It also demonstrates that this tortured interpretation is another result of the idea that asylum should be treated as a referral fee. Either the language for the purpose of IV-E exempts asylum or contingent fee cases for all the reasons that we set forth in the brief. And the executor's continued claim to the contrary offends common sense. Now, the court, if you filed a 2615, but prior to your filing the 2615, the plaintiffs filed a motion to dismiss, to voluntarily dismiss. The court didn't accept their motion to voluntarily dismiss and dismiss pursuant to 2615. So judgment on the pleadings. Was that error? Why not? Your Honor, and I respect the question, Your Honor, Mr. Cannelli is going to argue that voluntary dismissal. Oh, I didn't know we were splitting time. We aren't. That's okay. That's our request. All right. Go ahead. I want to address quickly the extrinsic evidence claims here. Extrinsic evidence should not be considered based on air safety alone. Although air safety involved pre-contract evidence as a factual, I'm sorry, involved pre-contract evidence as a factual matter, the opinion does not distinguish between pre and post. It simply bars extrinsic evidence when a facially unambiguous contract contains an integration clause. Period. Full stop. The executor's claim that air safety bars only pre and allows post is just made up. That conclusion cannot be reasonably drawn from the Supreme Court opinion. And the executor cites no cases authorizing post-contract evidence generally, let alone in cases with a facially unambiguous contract and an integration clause. There is also no logic or policy basis for distinguishing between pre and post when an integration clause is present. An integration clause means that the parties want intent to be determined solely by the language in the contract, by the language they carefully chose and agreed to, and not by outside documents or uncertain memories. Allowing post-contract evidence invalidates the integration clause and defeats the parties' intent. Post-contract evidence also goes much less to the core issue of what parties intended at the time of the execution than does pre or contemporaneous evidence. So if pre-contract evidence is not considered when an integration clause is present, as air safety teaches us, there is no basis to consider post-contract evidence, particularly evidence generated 13 years after execution. But even if post-contract evidence were to be considered, they shouldn't be considered here because the executor is using it for an improper purpose. As you all know, under provisional admission, extrinsic evidence is limited to explaining or clarifying ambiguous or vague terms. And the evidence must support an interpretation of those terms to which the contract is reasonably susceptible. It cannot be used to create an ambiguity where none exists or to change or rewrite a contract. But that is exactly what they are doing here. The executor is using the evidence to create a contingent fee exception in 4E that the plain language of the contract itself does not create and to which that language is not reasonably susceptible. But didn't he make a fee agreement? I'm sorry? I mean, how can you say that he doesn't have a contingent fee agreement? He had a contingent fee agreement. You're saying that he then says there is no contingent fee agreement because of the timing. But you can't dispute that there was a contingent fee agreement. Bill Murphy had a compensation agreement. He didn't have a contingent fee. He had a compensation agreement that covered all manner of fees. But the one-third, one-third, isn't that typically a contingency agreement on a PI case? Very respectfully, Your Honor, the fallacy underlying this entire claim, what most motivated it from the beginning is exactly that notion. Things have always been a one-third referral fee and it should be here. But to get to that conclusion, you have to ignore the law, you have to ignore the Supreme Court rules, and you have to ignore the contract. This compensation agreement replaced the idea of a referral fee. It is governed entirely by the compensation agreement and its terms. It's very clear and very simple terms governs who gets what. And the parties were free to decide what to do. You know, Bill's letter, and I want to make one other comment about Bill's letter because I've addressed the firm's letter. Bill's letter. But he's of counsel. Right. And he brought that case into that law firm. Right. That's not a referral. He's working there. He earned that referral fee. Exactly right. And he earns what the contract says he earns. Which is that third. Sorry? Which is that one-third. If, up until death. That's what it says. Well, you know, Mr. Dimitra brought up a good point. Can't that be manipulated? I mean, what if you have a case and you're like, oh, look, Bill's on death's door, let's hold off on settling that case until two months passes, or, you know, Bill died a month ago, let's wait and settle this case in February. Right. Can't that be manipulated? Your Honor, respectfully, you don't throw out a plain meaning of the contract because somebody might do something devious with it. Bad things can happen to all contracts. And the answer to that, as we make clear in our brief, is due diligence on the part of the parties. The answer is not to invalidate an otherwise facially acceptable and facially agreed to provision. Mr. Dimitra wants to write this section out of the contract. And as I was going to mention about Bill, Bill's letter, you know, Bill was one of the smartest people I knew and he was the best lawyer I ever met. But it doesn't mean his memory was perfect. And when Bill wrote that letter, it was right at the time he wrote it. He simply forgot that limitation of two months after he passes away, which is understandable because it was included in the contract for the first time 13 years earlier and never been revisited since. But he attached a copy of the agreement to the letter. Of course he did. Of course he did. So we can't – I mean, he forgot what he attached. You know, for us to be guessing about why it is that Bill – Well, you're guessing his memory wasn't perfect. But I'm saying it doesn't matter what he thought. We have to face the contract. We know what the contract says. It doesn't matter – just as it doesn't matter what Mr. Dimitra thinks that contract says, it didn't matter what Bill Murphy thought it says because we have a plain contract that on its face screams what it says. Let me ask a question on another point. The State makes a reasonable argument that the April 4th should have been considered the date of filing for the motion to voluntarily dismiss a numbering issue with the clerk. And they point out Justice Easterbrook's comment about the problems with e-filing. If it had been filed personally in the clerk's office, they would have just corrected that and accepted it. You know what I mean? Can I stand up here just one moment to take that on? And let me just make one other comment briefly about discovery since it was raised. You know, we are all experienced lawyers in this courtroom, and we know how to get discovery when we need it. And if you need discovery to respond to a dispositive motion, you issue it and you request it before the motion is briefed and submitted. You can't wait until you lose and then ask for discovery of the motion to reconsider. It's pretty basic. But the State didn't do that in all of the opportunities that we outline in our brief. What the State calls a discovery request here is a statement buried in a response brief that says discovery will be needed or should be permitted if the court finds, quote, if the court finds 4E to be ambiguous. It plainly implies that discovery wasn't needed then but may be needed in the future. The State denies that it's conditional, but we all have eyes and we can all read plainly. Calling it an alternative argument doesn't avoid waiver. It doesn't make the statement a request for immediate discovery or change that the statement was not made before briefing. Call it what you want. The State failed to ask for discovery when and how it should have. And that's waiver. It now blames the trial judge, and that's unfair. Thank you. Mr. Pinelli. I can agree with this. I'll be happy to answer any other questions, Judge. Could you address that point? I shall. First of all, in Kane County we have a specific rule with respect to consolidated cases, and it's indicated at pages 15 and 16 of our brief. And it says that if you have a consolidated case, you use the oldest case number, in this case it was 17L whatever. And when they filed their motion for voluntary dismissal on April 4th, they put down the wrong case number. And then they told Judge Ackerman and the trial court that it was the clerk's error, and this is a glitch. This is not a glitch. Because if you look at my brief, our brief, you'll see that we cite the rule, and there's a reason for the rule. And the rule says that it was user error, not the clerk's office error. The point of the matter is there was a way for the estate to ameliorate this filing. We have a rule in Kane County that says as follows. If you have good cause and can file an affidavit using Supreme Court Rule 191, then the court can give you relief and they can give you the earlier date. They never did that. They ignored it, and they blamed the clerk for the filing error. Now, there's another thing that's important here. At the time the motion to dismiss was filed, by the way, they never responded to the motion to dismiss. But the point of the matter is the motion to dismiss was filed. The court had already ruled in June or July of 2018 that the firm was entitled to judgment on the pleadings. I appeared on behalf of the individual lawyers and cited the provision that says there's no personal liability with respect to that. My point is this. At the time the motion to dismiss was adjudicated by Judge Ackerman, the only parties left in the case were the individual defendants. And Justice Zinov in 2009, in a case called Cui v. Walgreens, which I've cited in the brief, indicated that in circumstances that were exactly the same, that were the only remaining defendants, in this case was the individual defendants, that Section 2009B resulted in final disposition of the cause. So Judge Ackerman did not err with respect to refusing the voluntary dismissal because the motion to dismiss on its merits took precedence because it was claimed as positive with respect to the individual defendants who were the only ones left. And if you look at the agreement, it's clear that the personal lawyers never had any responsibility, any liability under this agreement. I hope that answers your question. I'll be happy to answer another one. On the judgment on the pleadings, the ruling on the judgment on the pleadings, we've been sitting here and we've been going back and forth with respect to 4B and what does that mean. I mean, doesn't the law say that if something is subject to more than one reasonable interpretation, judgment on the pleadings should not be entered? I mean, Mr. Dimitro is talking about retrospective fees, those already owed or those already earned. I mean, we're talking about the two-month period. Isn't there a lot of different ways that that can be interpreted? And was this the best case for judgment on the pleadings? I totally disagree, Judge. I do not believe it's subject to a reasonable interpretation. The agreement could not be clearer. The agreement terminated in 2004. Nobody knew what was going to happen in 2012 when Siler was filed. And with respect to the Siler agreement, the Siler agreement was with my law firm. It wasn't with Bill Murphy. Bill Murphy was an affiliated lawyer, and his compensation was tracked based on this agreement. And as everyone indicated, that worked well up until this time. I don't know what Bill is thinking. I'm not here to besmirch him in any way. Well, there's no contest regarding the fact that he did not come to you to ask to redraft the agreement. Absolutely, he never did. And the point of the matter is that the agreement terminated on his death. It would have terminated on my death. And I suspect the firm will still write the check in the event that we were to rule in your favor. The firm will still write a check for $150,000 to the estate. That was rejected. How do you distinguish the Eichengreen v. Rollins case, which talks about provisional admissions approach? Provisional admissions test, we don't get there because of air safety. This is a four-quarters rule, Judge. It's clear. With all due respect to the provisional admissions test, which I know this district has taken a great interest in, which I respect, we don't get there. This is a four-quarters case. There's no provisional admissions. In fact, you should just look at the contract. The letter is extrinsic. And if you take the letter at full value, take Bill's letter at full value, it doesn't change the result in this case. Judge Axten has spent a lot of time in this case. And with respect, we believe that you should affirm his decision. Well, our review is de novo, but we don't. I understand. No, I get that. Except on the motion to dismiss, it's abuse of discretion. Abuse of discretion, look at the community. On the dismissals of the individuals, but on the contract interpretation. Absolutely. You're totally correct, Judge. Thank you. Thank you very much. Nice to see you. Mr. DiNiccio. Mr. Connelly just said something that caught my attention. That if he had died, the contract is dead in the water. This contract, as he points out, was made in 2004. Hypothetical. Saylor comes in the very next day to that firm. And it's the significant case that we all know what to have been. And Bill, at age 84, wouldn't surprise anybody, dropped dead that very day. He's saying that 4B, out the window, it's all 4E because you're dead, and we're not going to be able to settle this case and get the money and ship it out within two months because it just came into the office. That makes no sense. That's lunacy. And that's why I go to my point. A plaintiff's lawyer, or his or her salt, or even a neophyte plaintiff's lawyer, would never, ever place a two-month cap on receiving what clearly in 4B says shall receive. Secondly, even though, you know, in our brief, initially, before there was a ruling initially by the circuit judge, we requested discovery because we wanted to learn the intent. We knew Bill's intent because we had his handwritten note, but we wanted to know the firm people. They made up the agreement. Bill didn't come up with this agreement, and we wanted to find out the intent. That's why we wanted it, and we did request it, contrary to what you've been told today and in the briefs. We didn't first request it at the hearing on the rehearing motion. It was done originally. Where is that in the record? It's in our brief. It's in our brief. It's in the record. Where is it in the record? What citation is in the record? Is it that there was a discovery request? Well, I assume we cited it. I hope we cited it. Do you know the page of the brief? I'm sorry. I didn't memorize it. Listen, with respect to counsel's comment about extrinsic evidence, you acknowledge what air safety says, correct? I do. Justice Heupel, I do acknowledge it. And I think, candidly, it applies here, okay? And it's up to our Supreme Court to take away the condition he placed on it. But I don't believe we need to deal with air safety. I'm requesting that this Court undo what was done at the trial level. This was a motion to dismiss. There was never an answer made to our complaint, and this was a fast-track motion hearing. So you're asking us to reverse the ruling on the 2615 and send it back for discovery? You know, let's see where it goes. Exactly. And I must say, you know, while justice is blind, over time courts such as this one have been able to find a little peripheral vision to do what's right, to do what's fair, to do what's reasonable. Bill Murphy believed 4B controlled, as I do. 4E, he believed, fine. He didn't want these guys running around chasing bills that were due at the time of his death. So I do ask that you reverse and order the trial court, it will be a new one, our trial court is retired, to proceed because the hospice defense here, please see through it when they tell you that with grace and dignity they wanted Bill to have his end-of-life provision. And all we're doing, says the firm, is we're trying to honor Bill's wish that two months, bye-bye, no fee for his family. That's not right, and it's not reasonable. Thank you. Thank you, Mr. Newman. Bill. The court thanks both parties for the quality of your arguments today. A written decision will be issued in due course. The court stands adjourned.